**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Jean Lifter, et al.,** | ) | **CASE NO. 1:15 CV 1055** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Cleveland State University, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

### Introduction

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 16).  For the following reasons, defendants' motion is GRANTED.

### Facts

Plaintiffs Jean Lifter and Sheldon Gelman filed this § 1983 Complaint against defendants Cleveland State University (CSU) and Craig Boise, individually.  As an initial matter, the Court notes that the Complaint alleges that plaintiffs, husband and wife, were both employed by CSU. Sheldon Gelman was a tenured professor at the law school until his May 2015 retirement and Jean Lifter was an Associate Dean of the law school until her termination in June 2014.  The Complaint asserts two claims arising under § 1983.  Count One alleges that defendants retaliated

1

against Gelman for exercising his rights secured by the First and Fourteenth Amendments. Count Two alleges that defendants retaliated against Lifter for Gelman's exercising his rights secured by the First and Fourteenth Amendments.  After briefing herein, plaintiffs concede that CSU is protected from suit by Eleventh Amendment immunity.  Plaintiffs also provide no argument regarding any Fourteenth Amendment violation.  Accordingly, this matter is a First Amendment retaliation claim against Boise in his individual capacity.

The parties present the following background facts. Facts specific to the claims will be addressed in the discussion of the claims.

Boise became Dean of Cleveland Marshall College of Law (hereafter, Cleveland-Marshall or the law school) in June 2011.  At the time, law school education was in a national crisis and the number of applicants to law schools had sharply declined. Gelman acknowledged at deposition that during this period, Cleveland-Marshall's application decline exceeded national averages. Cleveland-Marshall was attempting to improve its standing.  By memorandum of April 22, 2012, Boise introduced the "140 Plan" which called for a reduction of Cleveland-Marshall's entering class from 200 to 140 students.  The goal was to address budget concerns and maintain quality metrics.  It also called for expense reductions, faculty attrition, and a tuition increase. The 140 Plan did not include proposed faculty or staff layoffs.

Concerns about job security in light of decreasing law school enrollment led Gelman to consider the possibility of unionizing. On April 14, 2012, Gelman emailed Boise and stated, "As a follow-up to our conversation on Friday, some law faculty are planning to meet with union representatives to discuss the possibility of collective bargaining."  Gelman inquired about using law school space for the meetings.  By email of April 23, 2012, Boise stated that he had no

2

objection.  But, according to Gelman, Boise told him that a unionized faculty would make Boise's job more difficult. The issue of unionization divided the faculty, but in November 2012, Gelman announced to the faculty that the organizing drive had passed.  He also indicated that a request had been made to the State Employment Relations Board (SERB) to request recognition of a bargaining unit.  CSU president and Boise agreed to "take no hard stance against the unionization effort."

Minutes of the November 28, 2012 faculty meeting show the following. Boise mentioned a "disconnect" between himself and the faculty. Boise sensed that the faculty was becoming more divided and he pointed to the unionization effort as an example. Boise stated that Gelman had approached a staff member and asked for information to "go after Craig." Boise said, "Shame on you Sheldon Gelman.  Shame on you."

In the fall of 2012, Boise did not re-appoint Gelman to any of the previous various committees on which he had served with the exception of one which he sat on by virtue of his teaching.  But, in the spring of 2013, Boise appointed Gelman to the search committee to fill the position of Law Library Director at the law school.

In December 2012, several faculty members requested that CSU file a Petition for Representation Election with the State Employment Relations Board (SERB). In a June 19, 2013 email, Gelman announced to the faculty that SERB had formally notified the bargaining unit that it had won the election and was certified as the exclusive bargaining representative of the law school faculty.

In the spring of 2013, Boise decided the amount of merit raises the faculty members would receive the following year.  Boise awarded Gelman and others active in organizing the

3

bargaining unit a raise of $666 while other faculty received raises of between $3,000 or $5,000.

Plaintiffs state that Gelman's merit raise should have been at least $3000 under Boise's criteria

based on his publications and service. In a June 17, 2013 email to the Acting Provost, which

plaintiffs assert differs from Boise's declaration testimony, Boise explained his action:

> I write in response to your question during our telephone call today regarding how
> I arrived at a merit raise amount of $666 for 10 of the 37 members of the law
> school faculty.
>
> I initially set two merit raise categories based on faculty performance in the areas
> of scholarship, teaching and service, with the most meritorious faculty receiving a
> merit increase of $6,000 each, and the next most meritorious group of faculty
> receiving $3,000 each. Given a total merit pool of 2%, this would have resulted in
> about 14 of the 35 non-administrative faculty members not receiving any increase
> at all. Although these 14 faculty members did not merit a raise on the order of
> that received by the remaining 21 faculty members, I was reluctant to not provide
> *any* pay increase to 10 of these faculty members, as most faculty members
> received at least a $500 merit increase in FY13. Accordingly, I asked my Budget
> Director, Jeane White, to reduce the top merit raise to $5,000 and divide the
> surplus among the 10 faculty members to achieve a merit increase close to $500
> per faculty member. After calculating all merit raises and two equity adjustments,
> the resulting merit amount was $666 per faculty member.

Boise states in his declaration testimony, "At no time did I specifically request that a raise of

$666 be awarded to any faculty member, but rather this raise amount was the result of a

mathematical calculation."

According to Tim Long, CSU's Associate Vice President, Finance and Technology, each

college (including the law school) within CSU submits its budget to him by April of each year.

Projections for each college's entering class size for the following year must be made in April so

that each respective budget can be completed.  The budget process is tied to the admission cycle.

Enrollment in Cleveland-Marshall had been steadily declining for over a decade. Between the

fall of 2011 and the fall of 2015, the number of student credit hours actually taken at the law

4

school decreased by 28% which required it to significantly reduce its permanent budget over this time period.  Like the other colleges, the law school's annual budget is built by using a projected number of incoming students for the upcoming year. The projection of each college's entering class size for the following year must be provided to Long with a budget in April. Once submitted, the budget cannot be changed.  In February 2014, Cleveland-Marshall was projecting an entering 1L class size of 90 to 100 students for the fall of 2014.  As a result, Long advised Boise that "he should be examining reductions to Cleveland-Marshall's budget for the year 2014-2015 of at least $1,000,000." In mid April 2014, Long engaged in an email exchange with Boise and the CSU Provost regarding the need for the law school to reduce its permanent budget for the 2014-2015 year in the range of $800,000, finalize its decision on projected 1L entering class size for the upcoming fall, and finalize its expense reduction plan. In April 2014, Boise submitted the law school budget to Long which was based on a projected incoming 1L class size of 125 students. After this submission, the budget cannot be changed. In mid April 2014, Long engaged in an email exchange with the CSU Provost which discussed the law school's permanent budget reductions for the 2014-2015 year totaling about $735,000 and which included the elimination of Lifter's position. Actual enrollment for the fall does not impact the annual budget once it has been set.

According to Boise, in February 2014, he engaged in an email exchange with Chris Lucak, the law school's Assistant Dean of Admissions and Financial Aid, which discussed Lucak's projection of 91 1L students for the fall.  Based on that projection, Long advised Boise that significant cuts to the law school's budget would be required. In response to Long's mandate regarding significant cuts to the budget, Boise requested Mark Sundahl, Associate Dean for

Administration, "to evaluate whether potential personnel efficiencies at Cleveland-Marshall could be realized through reassigning or eliminating job responsibilities." Boise also created a Budget Task Force comprised of various faculty and staff members and requested the task force to provide him with recommendations to reduce the law school's budget by $500,000 and $1,000,000 for the year 2014-2015.   In March 2014, the task force provided Boise with its recommendations for budget cuts which Boise accepted and implemented but further cuts were needed. Sundahl ultimately concluded that current staff and faculty members could assume the job duties of the Assistant Dean for Academic Affairs, Lifter's position.  Sundahl recommended that Lifter's position be eliminated and that her job duties be reassigned to other current employees of the law school. By mid-April 2014, Boise was required to provide CSU with the projected 1L class size for the fall of that year so that the budget could be finalized.  Based on the enrollment reports and analysis received from Lucak, Boise projected an incoming 1L class of 125 and the budget was based on this projection. As a result, CSU required that approximately $735,000 be cut from the Cleveland-Marshall budget. Boise accepted nearly all of the task force's recommendations and decided to eliminate Lifter's position.  He then submitted the budget in April 2014.  Boise prepared the Rationale for Reduction in Work Force for the elimination of Lifter's position.  It was signed by Boise on June 18, 2014. It was approved by CSU and Lifter was notified at the end of June 2014.  The elimination of Lifter's position was effective July 31, 2014. Since the elimination of her position in the student services center, Boise states that the center continues to operate more efficiently as Lifter's prior duties were reallocated to existing employees enabling Cleveland-Marshall to realize annual savings of $132,116.

6

Plaintiffs point out that Boise's initial recommendation to the Budget Task Force included that three vacant positions not be filled and four positions eliminated, including Lifter's.  The day before the task force submitted its report to Boise on March 19, 2014, Sundahl sent Boise the list of Lifter's job duties.  Her list of job duties was the only one Boise requested that Sundahl prepare.

On June 30, 2014, in an email to the faculty responding to the negative reaction generated by Lifter's announcement to the law school that her job had been eliminated, Boise wrote in part:

> On the day that I was required to make a final decision about what I expected our entering class for this year would be, we had received second deposits from 142 students. Based on our historical summer melt percentage, which has been around 10%, that would leave us with 127 students this fall. Thus, that we would enroll a class of 125 students seemed to be a prudent assumption to make based on the information that was available when I had to make the final budget decision.

Boise testified at deposition that the "summer melt percentage" was actually around 3% and not 10%. At the September 11, 2014 faculty meeting, Boise responded to the written "Motion by the Cleveland-Marshall College of Law Faculty Disapproving of Dean Boise's Budget-Reduction Process and Recommendation to Terminate Assistant Dean Jean Lifter." The minutes of the meeting state, in part,

> Dean Boise distributed the Admissions Report for the week ending April 11, 2014. He stated that the College of Law must submit our budget to the administration on April 15, 2014.  He must make the most realistic, conservative projection based on the data before him at that time. He based the projected class size on the numbers in this report.  At that time we had 130 first seat deposits.  Our historic melt rate from first deposits is 17%.  That means that our projected class size on April 11th would have been 108 students.  Even that projection would have been overly optimistic since our applications were down 28% and there were only 142 other applications still with no action.
>
> Boises's initial recommendation to the task force indicated that the savings in eliminating

7

Lifter's position would be $51,116.  Plaintiffs state that these savings were lost by other proposed cost increases initiated by Boise.

According to Lifter, she filed a grievance with CSU in July 2014 after her position was eliminated.  The grievance was denied by CSU. Lifter and Gelman also filed Unfair Labor Practice Charges with SERB over Lifter's termination.  As evidenced by Lifter's September 2014 charge against Boise, the factual basis states that Boise retaliated against her because of her husband's protected union organizing activities which Boise opposed.[1]  In its February 2015 Dismissal of Unfair Labor Practice Charge as to Lifter, SERB concluded that the investigation revealed no probable cause that Cleveland-Marshall discriminated and retaliated against Lifter for her husband's protected/concerted union activity.  SERB found that Lifter failed to establish a prima facie case of discrimination and there was no nexus between the layoff and Gelman's union activity. In its February 2015 Dismissal of Unfair Labor Practice Charge as to Gelman, SERB likewise concluded that the law school did not discriminate against him, there was no nexus between his protected activities and his wife's layoff, and the law school had demonstrated that its actions were not based on anti-union animus but that Lifter's layoff was implemented due to the need to reorganize because of budgetary issues.

In January 2015, Gelman and other faculty received a letter from Boise regarding an early retirement incentive. Gelman thereafter accepted the incentive buyout.

This matter is now before the Court upon defendants' Motion for Summary Judgment.

**Standard of Review**

---

[1]     It appears that the Court has only a copy of Lifter's charge, but has the SERB dismissals of both Lifter's and Gelman's charges.

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial

9

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**<u>Discussion</u>**

**(1) Collateral Estoppel**

Defendants initially assert that plaintiffs' claims are collaterally estopped. Plaintiffs disagree. For the following reasons, the Court finds the claims are not collaterally estopped.

Collateral estoppel, also known as issue preclusion, "precludes the relitigation of an issue that has been actually and necessarily litigated and determined in a prior action." *MetroHealth Med. Ctr. v. Hoffman-LaRoche, Inc.,* 80 Ohio St.3d 212 (1997). Four elements are necessary: (1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding. *Georgia-Pac. Consumer Products LP v. Four-U-Packaging, Inc.,* 701 F.3d 1093, 1098 (6th Cir. 2012) (citations omitted).

Collateral estoppel "applies to quasi-judicial administrative proceedings as long as the parties have had an ample opportunity to litigate the issues involved in the proceeding." *Anderson v. City of Blue Ash*, 798 F.3d 338, 351 (6th Cir. 2015) (citing *State ex rel. Schachter v. Ohio Pub. Emps. Ret. Bd.*, 121 Ohio St.3d 526 (2009));  *Grava v. Parkman Twp*., 73 Ohio St. 3d 379, 381 (1995) (internal citations and quotations omitted) ("We explained that res judicata,

10

whether claim preclusion or issue preclusion, applies to administrative proceedings that are of a judicial nature and where the parties have had an ample opportunity to litigate the issues involved in the proceeding.")

"The Sixth Circuit has recognized that under Ohio law, res judicata and collateral estoppel generally apply to quasi-judicial decisions made by administrative agencies from which no appeal has been taken." *Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*, 844 F. Supp. 2d 873, 883 (S.D. Ohio 2012) (citing *Burkholder v. Bower Tiling Serv.*, 1994 WL 730464 (6th Cir. Jan 5, 1995)).  *See also Carroll v. City of Cleveland,* 522 F. Appx 299, 303-04 (6th Cir. 2013) (citing (citing *Wade v. City of Cleveland*, 8 Ohio App.3d 176 (8th App. Dist.1982)). ("At the threshold, and contrary to Appellants' argument, claim preclusion is applicable to actions which have been reviewed before an administrative body, in which there has been no appeal made pursuant to R.C. 2506.01.").

"An administrative proceeding is quasi-judicial for purposes of res judicata if the parties have had an ample opportunity to litigate the issues involved in the proceeding." *State ex rel. Schachter v. Ohio Pub. Emps. Ret. Bd.*,121 Ohio St. 3d 526, 530 (2009) "SERB is a quasi-judicial state agency that oversees public-sector labor issues in Ohio." *Kingsley v. Brundige*, 513 F. Appx 492, 494 (6th Cir. 2013).

As set forth above, Lifter and Gelman filed Unfair Labor Practice Charges with SERB over Lifter's termination.  Lifter's charge is against Boise and Cleveland-Marshall and alleges that Boise retaliated against her because of her husband's protected union organizing activities. The dismissal of Gelman's charge shows that he alleged the same. These are the same factual allegations as alleged in Count Two herein.

Lifter testified that she had "an opportunity to present whatever evidence and information that [she] thought was necessary to support [her] contention to the State Employment Relations Board."  (Lifter depo. 114-115) SERB dismissed both charges "with prejudice for lack of probable cause" that Lifter was discriminated and retaliated against for her husband's protected/concerted union activity. (Doc. 16 Exs. 38, 39)  SERB found no nexus between the layoff and Gelman's union activity and that the law school had demonstrated that its actions were not based on anti-union animus but that Lifter's layoff was implemented due to the need to reorganize because of budgetary issues. (*Id.*)

Plaintiffs do not dispute the above, but contend that they are not collaterally estopped because SERB's decision to not issue a complaint in response to the charge is neither quasi-judicial or adjudicatory, nor reviewable as required for collateral estoppel to apply. *Nelson v. Jefferson Cty., Ky.*, 863 F.2d 18, 19 (6th Cir. 1988) (internal citations omitted) ("An administrative board acts in a judicial capacity when it hears evidence, gives the parties an opportunity to brief and argue their versions of the facts, and the parties are given an opportunity to seek court review of any adverse findings.") Plaintiffs rely on *Ohio Assn. of Public School Employees, Chapter 643, AFSCME/AFL-CIO v. Dayton City School Dist. Bd. Of Educ.*, 59 Ohio St.3d 159 (1991), wherein plaintiffs note that the Ohio Supreme Court stated,

> Before a complaint is issued [by SERB] there is no requirement for notice, hearing, and the opportunity for introduction of evidence. Because there has been no hearing, there is no record to be filed with the reviewing court as required by R.C. 4117.13(A) and (D). The only record of SERB's investigation is its investigatory file, which is confidential. SERB's role in this early stage of the proceeding is most closely analogous to that of a public prosecutor investigating a citizen's complaint of criminal activity. In either case, the decision not to prosecute is discretionary, and not generally subject to judicial review.

*Id.* (internal citations and quotation marks omitted). Accordingly, the court held that "a decision

12

by SERB whether or not to issue a complaint in an unfair labor practice case is not reviewable pursuant to [the Ohio Revised Code]." As such, plaintiffs contend, because there was no appealable order, collateral estoppel does not apply. [2]

This Court agrees with plaintiffs. The Ohio courts recognize, "Probable cause determinations by SERB under R.C. 4117.12(B) are not reviewable by direct appeal." *State ex rel. Howard v. State Emp. Relations Bd.*, 2016 WL 3579013 (Ohio 10th App. Dist. June 30, 2016) (citing *Ohio Assoc. of Public Emps., Chapter 643 v. Dayton City School Dist. Bd. of Edn.*, *supra*).[3]  Furthermore, as plaintiffs point out, SERB additionally dismissed Lifter's charge for lack of standing because she was not a public employee.  (Doc. 16 Ex. 38) And, the dismissal of Gelman's charge seems to indicate that his charge was based on his allegation that his activity resulted in his wife's lay-off and not, as alleged in Count One herein, that defendants retaliated against him by reducing the size of his merit raise and depriving him of faculty committee appointments.  (Doc. 16 Ex. 39)

For these reasons, the Court does not find that the First Amendment retaliation claims against Boise asserted in Counts One and Two are precluded by the doctrine of collateral estoppel.  Therefore, it will proceed to the merits of the claims.

### (2) First Amendment Retaliation

---

[2]     Defendants distinguish *Dayton City Schools* with *Local 1497 IAFF v. DiMora*, 1990 U.S.Dist. LEXIS (N.D.Ohio Sept. 17, 1990). But, this Court will not rely on that district court opinion where the Sixth Circuit affirmed without a separate opinion. *Local 1497 IAFF v. DiMora,* 1991 WL 100598 (6th Cir. 1991).

[3]     Thus, it would appear that SERB determinations are different from other quasi-judicial administrative determinations that a party may appeal to the court of common pleas pursuant to O.R.C. § 2506.01.  *See Carroll v. City of Cleveland*, *supra*.

"To make out a prima facie claim for First Amendment retaliation[4] under § 1983, a plaintiff must show that (1) he engaged in constitutionally protected speech, (2) he was subjected to adverse action or was deprived of some benefit, and (3) the protected speech was a substantial or a motivating factor in the adverse employment action." *Tompos v. City of Taylor,* 2016 WL 1319215, - Fed.Appx.-, (6th Cir. Apr. 5, 2016) (citing *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir.2001) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). In other words, the third element requires a causal connection between elements one and two. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014). "The analysis of a defendant's motives in retaliation claims is well established: the plaintiff has the burden of establishing that his protected conduct was a motivating factor behind any harm, and then the burden of production shifts to the defendant, who must show that he would have taken the same action in the absence of the protected activity."*Gritton v. Disponett,* 332 Fed.Appx. 232 (6th Cir. 2009). *See also Benison v. Ross*, *supra* ("If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.")

**(a) Gelman**

Count One alleges that Gelman was retaliated against for exercising his First Amendment

---

[4]    Boise raises the defense of qualified immunity. Thus, the Court's initial inquiry is "whether the facts alleged demonstrate a violation of [plaintiffs'] First Amendment rights..." *Stinebaugh v. City of Wapakoneta,* 630 Fed.Appx. 522 (6th Cir. 2015).

rights by "reducing the size of the merit raise to which he was otherwise entitled, by depriving him of faculty committee appointments, and taking other adverse action against him." Defendants contend that Gelman fails to establish a prima facie case because he suffered no adverse employment action.  Even so, there is no evidence of pretext.

Plaintiffs argue that Gelman suffered two adverse employment actions.  First, his spouse was terminated as a result of his protected activity and courts recognize that retaliatory actions taken against a close relative by an employer are adverse actions.  Second, Boise awarded Gelman a pay raise of $666 in 2013, a raise that was lower than he was entitled to under Boise's own criteria.

Count One does not allege that defendants retaliated against Gelman by terminating his wife. However, the Court agrees with plaintiffs that the lower merit raise may be an adverse employment action. *See Alexander v. Ohio State Univ. Coll. of Soc. Work*, 697 F. Supp. 2d 831, 842 (S.D. Ohio 2010), aff'd, 429 F. App'x 481 (6th Cir. 2011) ("A performance evaluation that directly impacts an entitlement to an increase in salary is an adverse employment action.) Plaintiffs must then demonstrate that the union activity was a substantial or a motivating factor in the awarding of the lower raise and defendants must show that they would have taken the same action in the absence of Gelman's union activities.

Gelman asserts that under Boise's own criteria, he should have received at least a $3000 merit raise. He was awarded two points for "scholarship" for publishing one article.  (Doc. 20 Ex. 18) Yet, Gelman asserts he had written two articles during the relevant period. (Gelman depo. 99) However, Boise relied on the Faculty Report submitted to him by Gelman as a primary factor in the award of the merit raise. (Boise decl. ¶ 9) According to the information Gelman

15

provided in the report, he had authored and published only one law review article during the previous two years and had not engaged in any professional online writing or scholarly activity. (*Id.*) In particular, the report asks for a list of "publications completed during the past two calendar years" (i.e., 2011 and 2012). Gelman listed an article "forthcoming in 2013" and one "published in 2011 but written earlier." He listed one article published in the Albany Law Review (2011/2012). (Doc. 16 Ex. 11) Thus, Gelman's report showed that he completed one article for publication during the relevant time period.

As for "service," Gelman disagrees with his score of 0 points. (Gelman depo. 100) And, Gelman faults Boise for not appointing him to law school committees as he had done the previous year. However, according to Boise, "other than committee work, Gelman did not list [on his Faculty Report] any activities or information under the categories of Professional Service, Community Service, or Contributions to building and sustaining the law school community." (Boise decl. ¶ 9) Gelman's Faculty Report shows committees he served on in the College of Law and CSU, but reported nothing under "Professional service" or "Community Service."  (Doc. 16 Ex. 11)

On this basis, the Court does not find an issue of fact as to whether Gelman's union activities were a motivating factor in the amount of the merit raise awarded or whether Boise would have awarded the same amount in the absence of Gelman's union activities.

Additionally, as explained by defendants, Boise's declaration testimony, supported by contemporaneous emails, show that Boise had an honest explanation in awarding the merit raises.  In March 2013, CSU assigned a merit raise pool equal to 2.5% of the total salaries of the law school's faculty, or $102,569. Boise ranked each faculty member according to their teaching,

16

scholarship, service, and other contributions. He created two top tiers of merit raises ($5000 and $3000). The remaining pool was divided among the rest of the faculty (including Gelman) and they were to receive merit raises of $727.  In April, Boise was notified by CSU's Director of Fiscal Operations that it had provided him an incorrect number for his merit pool and thus the raises needed to be reduced by $3,067.  The next day, Boise resubmitted the merit raise awards making adjustments for a few particular individuals and then again divided the remainder among the rest of the faculty. This time the mathematical calculation resulted in 10 faculty members who were previously to receive $727, receiving $666 in additional salary. Boise's corrected faculty merit raises were approved. (Boise decl. ¶¶ 10-14; Exs.)

Summary judgment is appropriate as to Count One. [5]

**(b) Lifter**

Count Two alleges that defendants retaliated against Lifter for Gelman's First Amendment activities by terminating her employment. Defendants argue that there is no evidence of pretext. Where there are "questions of fact surrounding [the termination], it follows that there are questions of fact as to whether the speech was a substantial or motivating factor" for it.  *Stinebaugh v. City of Wapakoneta,* 630 Fed.Appx. 522, 530 (6th Cir. 2015).  As discussed

---

[5]    Additionally, the Court notes that the union filed an unfair labor practice charge with SERB against the law school over the $666 raises. On November 14, 2013, SERB dismissed the charge with prejudice for lack of probable cause and found that the law school  "did not take adverse action against the [union] organizers, nor is there a reasonable inference of adverse action when they were awarded a merit increase of $666 or $0." (Doc. 16 Ex. 20) SERB also noted, "Although it is suspect that the majority of the faculty receiving the $666 raises were the union organizers, the Charged Party provided a plausible explanation as to how the merit raises were awarded..."  (*Id.*)

below, the Court finds no issue of fact as to motivation.

Defendants contend that Boise terminated Lifter to meet the budget reductions required by CSU.  Ample evidence is discussed above supporting this reason.  Additionally, the June 2014 paperwork completed by Boise for the elimination of Lifter's position attached a separate paper explaining the "rationale for layoff" which indicates the following.  The number of law school applications had been precipitously declining since 2009, culminating in the smallest amount for the fall 2014 entering class. In response to the applications decline, the 140 Plan was instituted in 2012 to reduce the entering class from 200 to 140 along with a tuition increase and budget cuts. In early February 2014, the law school was asked to project class size for FY2015 which resulted in an estimation of 90 to 100 students. Tim Long, AVP for Finance and Technology, advised the law school that a class of that size would require significant further budget cuts. Because the largest potential budget cuts were salaries, Boise asked Associate Dean for Administration Sundahl to evaluate where personnel reductions might be made in the law school by reassigning or eliminating job responsibilities. Sundahl concluded that administration and staff members could assume Assistant Dean Lifter's responsibilities if the position were eliminated. Her salary was also the largest of those reporting to Sundahl. Boise also appointed a Budget Task Force which, among other things, was given six potential reductions to consider, including the Assistant Dean for Academic Affairs- Lifter's position. By mid-April applications remained down and a class size of 125 incoming students for FY2015 was projected. The projected budget shortfall based on the 125 class size was over $700,000.  In order to close the deficit, several budget cuts suggested by the task force were adopted including the elimination of the Assistant Library Director position, elimination of a support staff position, relinquishing an

18

open clinical faculty position, reducing travel expenses, eliminating summer research grant support, and reducing the number of adjunct-taught courses.  But, additional reductions were necessary as these fell short in closing the deficit.  The task force had observed in its report that administrative salaries were one of just five expense lines in the budget that had increased from FY2011 through FY2014, while there had been reductions for doctrinal and clinical faculty members.  Accordingly, the Assistant Dean for Academic Affairs position would be eliminated with four other positions assuming the duties as part of a total package of budget cuts to reduce the law school deficit. (Doc. 16 Ex. 34)

Plaintiffs assert that the evidence casts doubt on Boise's true motivation given that Boise has offered conflicting reasons for terminating Lifter, the only person at the law school who was terminated.  Plaintiffs point to the following. At the time of her termination in June 2014, Boise informed the faculty by email of June 30, 2014:

> On the day that I was required to make a final decision about what I expected our entering class for this year would be, we had received second deposits from 142 students. Based on our historical summer melt percentage, which has been around 10%, that would leave us with 127 students this fall. Thus, that we would enroll a class of 125 students seemed to be a prudent assumption to make based on the information that was available when I had to make the final budget decision.

(Gelman decl. Ex. A)  Boise acknowledged at deposition that according to an Admissions report, as of June 2014, 143 second seat deposits (i.e., those committing to attend) had been paid which exceeded the previous year's. (Boise depo. 192)

Plaintiffs assert that this email made no reference to budget cuts demanded by CSU other than to account for a smaller class. With regard to how he determined the smaller class, Boise testified at deposition that the "summer melt" was only 3%, not 10%. (*Id.* 199)

Additionally, in September 2014, Boise told the faculty that he based his decision on 130

19

"first seat deposits" and that "our historic melt rate from first deposits is 17%." (Doc. 20 Ex. 23) Moreover, Boise had asked Sundahl for a list of Lifter's job duties before the Budget Task Force had submitted its report to him.  (Sundahl depo. 29-30) Plaintiffs assert that Boise's explanation to the faculty differed from his rationale given to the university in his Rationale for Reduction in Work Force (discussed above).

For the following reasons, the Court finds no issue of fact as to whether Gelman's union activities were a motivating factor behind Lifter's termination or whether Boise's decision to terminate her would have been the same absent Gelman's conduct.

Initially, defendants point out that plaintiffs do not dispute the following facts which show that Boise's decision to eliminate Lifter's position was prompted by budget cuts mandated by CSU- his asserted reason for her termination. Gelman acknowledged that during the relevant time, the law school experienced application decline that exceeded the national averages. (Gelman depo. 40) The declaration testimony of CSU's Finance and Technology Vice President Tim Long, who oversees CSU's annual fiscal budget, is that the budget is tied to the admission cycle and the law school's enrollment had been steadily declining for ten years with a 28% decline in student credit hours since 2011. Projections for fall enrollment had to be submitted to him by April. (Long. decl.) The law school's Assistant Dean of Admission and Financial Aid Christopher Lucak presented testimony that by mid-April, the number of applications was significantly down (28%) from the previous year. Based on the admission information that he supplied, Boise estimated in April 2014 that the incoming 1L class size for the fall of 2014 would be 125.  This was an aggressive estimate and higher than the projection Lucak had provided to Boise at that time. (Christopher Lucak decl.)  According to Long, Boise submitted

20

the law school's budget to him with a projected first year class size for the incoming year of 125. On this basis, CSU required that the law school reduce the budget by $735,000. Boise submitted his budget which included the elimination of Lifter's position.  (Long decl.)

Plaintiffs' arguments that Boise's reason for eliminating Lifter's position changed are not persuasive.  Boise's June 30 2014 email to the faculty is consistent with the reason that he eliminated Lifter's position- budgetary constraints: "[T]he University did require us to make budget cuts sufficient to offset any revenue lost by virtue of a smaller entering class for FY 2015. Those budget cuts totaled nearly $735,000, and included the elimination of four positions... and as you know, ... Jean Lifter."  (Doc. 20 Ex. 24 Ex. A)

Plaintiffs cite the reference in this email misstating that there were 142 deposits at the time Boise eliminated Lifter's position.  However, Boise later corrected the misstatement showing that these deposits had not been received as of mid-April when the budget was set and the decision made. In his statements to the faculty in the September 11, 2014 meeting, Boise communicated that "the College of Law must submit our budget to the administration on April 15, 2014."  (Doc. 20 Ex. 23) And the minutes also showed,

> Professor Gelman stated that the decision-making was inconsistent with Dean Boise's June 30th email.  At that time Dean Boise stated that there were 142 second seat deposits, and that based on a historical 10% melt, he estimated an incoming class of 125.  Jean Lifter looked at the past summer melt percentages and they have never exceeded 6%.  On April 11th we were running 50% ahead of previous year in terms of melt and one-third ahead of last year in second deposits. According to Christopher Lucak, Assistant Dean of Admissions, we were getting no calls from students saying they had an offer from Akron, which has been in past years a large source of poaching.  Therefore, the Board of Trustees was misinformed in June when they were told that the estimate form the incoming class was 120.  Dean Boise responded that he had previously acknowledged that the numbers he cited in his June 30th email supported a smaller projected class size, but were based on the wrong date. The numbers on the correct date, April 15, even more strongly supported an expectation of a reduced class size.

21

(*Id.*)

Further, in an October 2014 email to the faculty responding to questions raised in a prior email from Gelman, Boise stated:

> It's important to understand, as I have stressed before, that our minimum entering class size of 125 was determined in April when our budget was submitted to the university administration. At that time, a reasonable projection of our entering class size would have been well below 125 students. College budgets are not subsequently revised after submission, regardless of additional data that may become available. To change projections of our class size in late June would require the recalculation of an entire university budget that must be approved by the Board in that month. This is unfortunate, because it means our projections must be made very early in the admissions cycle, but it is the system within we work.

(Doc. 16 Ex. 37) Plaintiffs also point out that Boise cited different melt rates in his June 2014 email to the faculty and his September 2014 comments at the faculty meeting. (Doc. 20 Exs. 24 and 23). Again, these do not alter the reason for the decision- budgetary constraints based on enrollment projections which had to be made in April 2014 and were set for that year.

Moreover, defendants point out that the reason for the decision, i.e., a consequence of the direction by CSU to cut the budget, was stated consistently in Boise's various statements concerning Lifter's termination: 1) The June 18, 2014 paperwork completed by Boise for the elimination of Lifter's position gives as its rationale the budget cuts mandated due to the mid-April projected incoming class size of 125. (Doc. 16 Ex. 34) 2) The June 30, 2014 email from Boise to the faculty explains that the projected entering class of 125 required that budget cuts be made and which resulted in the elimination of four positions, including Lifter's. (Doc. 20 Ex. 24) 3) Boise's August 4, 2014 written response to Lifter's grievance states that budget cuts were necessary based on the reasonable projections for FY2015 enrollment and the 125 student projection was a "prudent assumption" made on the information available. (Doc. 20 Ex. 21) 4)

22

Boise's oral statements made at the September 11, 2014 faculty meeting explain how he made "the most realistic, conservative projection [of class size] on the data before him" at the time he had to submit the budget in April 2014.  (Doc. 20 Ex. 23) 5) Boise's October 26, 2014 email to the faculty responds to points raised in Gelman's earlier emails and again stresses that "our minimum entering class size of 125 was determined in April when our budget was submitted to the university administration.  At that time, a reasonable projection of our entering class size actually would have been well below 125 students..."  (Doc. 16 Ex. 37) These pre-litigation statements are consistent with Boise's declaration testimony herein that he eliminated Lifter's position "based on CSU's requirement that Cleveland-Marshall's budget for 2014-2015 be cut by approximately $735,000, and the fact that the Task Force's recommendations did not provide immediate budget cuts of this amount."  (Boise decl. ¶ 28)

The law school had to submit its budget to CSU by mid-April each year. Once submitted, the budget cannot be changed. The class size projection had to be made by that time. There is no evidence that the class size projections made by April 2014 were wrong or based on faulty information. Even had the entering class for 2014 exceeded the projected amount, it would not have affected the budget.

Contrary to plaintiffs' assertion, the fact that the law school had 142 second seat deposits in June 2014 would not have impacted the budget which was set in April as Tim Long stated that any activities taking place after April 2014, including increased enrollment, could not have impacted the law school's budget for that year.  (Long decl. ¶ 13)

For these reasons, there is no issue of fact as to whether Gelman's union activities were a

23

substantial or motivating factor behind Lifter's termination.[6] Summary judgment is appropriate as to Count Two.[7]

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.


          /s/ Patricia A. Gaughan
          PATRICIA A. GAUGHAN
Dated: 8/17/16          United States District Judge

---

[6]    Furthermore, defendants present ample evidence that Boise actually provided positive benefits to faculty members who were active in the union organizing campaign, including Gelman. This casts doubt on plaintiffs' assertion that Boise's motivations were to punish Lifter for Gelman's activities. In particular, Brian Glassman, who Gelman identified in his deposition as a "union organizer" (Gelman depo. 80), had his contract renewed by Boise for a period of five years in February 2014. (Boise decl. ¶ 19, 24, Doc. 16 Exs. 21, 25)  Boise awarded Brian Ray, identified by defendants as the "union's chief negotiator" and by Gelman as a union supporter (Gelman depo. 84), the highest possible merit raise in 2012 and 2013. (Doc. 16 Exs. 12, 14). In the spring of 2013, Boise appointed Gelman to the search committee to fill the position of Law Library Director at the law school, a tenured faculty position. (Boise decl. ¶ 16) In June 2014, Boise approved Gelman's request for the purchase of a $1000 standing desk. (*Id.* ¶ 17) In the spring of 2014, Boise promoted Milena Sterio, a union member and proponent, to the position of Associate Dean over several candidates who were not affiliated with the union but who applied for the position.  (*Id.* ¶ 33) Finally, Boise awarded Gelman a retirement incentive buyout payment of $93,414 in February 2015. (Gelman depo. 193; Ex.1 Interrogatory No. 17)

[7]    Because the Court finds that summary judgment is warranted on Counts One and Two, it need not reach defendants' arguments that 1) plaintiffs failed to mitigate their damages by not looking for other employment after leaving CSU and 2) plaintiffs' damages must be reduced by amounts they received as retirement benefits from STRS and OPERS.